# EXHIBIT 2



February 15, 2013

Kenneth Gorenberg, Partner
Barnes & Thornburg, LLP
Attorneys at Law
One North Wacker Drive, Suite 4400
Chicago, IL 60606

***Re: The Georgia Operators Self Insurers Fund v PMA Management Corp***
***Civil Action File No. 1:12-cv-02578-ODE***

Dear Mr. Gorenberg:

Enclosed is the report of my opinions following the review of files handled by PMA on behalf of The Georgia Operators Self Insurers Fund. My opinion is based on my training, background and experience for the past thirty-nine years of workers' compensation claim management.

My opinions are based on the information that I have been provided. This report is subject to revision upon review of any further report that the opposing party may file with the Court.

Pursuant to the requirements of Federal Rule 26 of Civil Procedure, attached are the following:

Confidential Report of Findings
Exhibit A: Vitae of Doug McCoy
Exhibit B: List of past cases involving testimony at trial or deposition
Exhibit C: Statement of charges for this case
Exhibit D: List of all documents reviewed in this matter
Attachment One: List of all files/damages

Please advise if you require any further information.

Very truly yours,

Doug McCoy
SCLA, CWCP, RWCS, LPCS, WCCLA, CCLA, PCLA, FCLA, ACLA

GAOSIF00038367

**Confidential Report of Findings**

## Introduction

At the request of Kenneth Gorenberg of the law firm of Barnes and Thornburg, LLP, McCoy Consulting, Inc. has conducted an audit of claim files handled by PMA on behalf of the Georgia Operators Self Insurers Fund. This audit was conducted in anticipation of litigation.

We had previously conducted a Claim Management and Effectiveness Study for the Georgia Operators Self Insurers Fund and submitted a report of our findings on 11/30/2011.

We received from PMA a list of GAOSIF claims that PMA handled on behalf of GAOSIF. Eight-eight files were selected to review with total incurred losses greater than $50,000.00 each. The total incurred, as reported by PMA on the list provided, for the 88 files was $10,734,166.00. Thirty-two of those 88 claims were previously reviewed during our Study in 2011. All claims, including the 32 previously reviewed, were updated to the current time period for this report.

Our findings identified and confirmed several issues that were evident following our Claim Management and Effectiveness Study in November of 2011. PMA does not take steps to ensure that their own Action Plans are carried out. If PMA followed their own Action Plans in a timely manner utilizing their own analysis of the necessary steps to take to resolve claims, there would have been substantial savings for the Georgia Operators Self Insurers Fund.

This includes many instances of PMA failing to file necessary Georgia Forms that would limit the overall exposure of the claim, affecting the evaluation and negotiation of settlements.

Wage Verification: Since the majority of employees in the GAOSIF are low wage earners, it is required that a form WC-6 be obtained to comply with the calculation of average weekly wage as required by §34-9-260. In some instances PMA failed to obtain the required form and in others they failed to confirm the average weekly wage resulting in an error in calculating the average weekly wage and compensation rate resulting in overpayments.

> **Georgia statute §34-9-260** Except as otherwise provided in this chapter, the average weekly wages of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined, subject to limitations as to the maximum and minimum amounts provided for in Code Sections 34-9-261 and 34-9-265, as follows:
>
> **(1)** If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of 13 weeks immediately preceding the injury, his average weekly wage shall be one-thirteenth of

the total amount of wages earned in such employment during the 13 weeks;
**(2)** If the injured employee shall not have worked in such employment during substantially the whole of 13 weeks immediately preceding the injury, the wages of a similar employee in the same employment who has worked substantially the whole of such 13 weeks shall be used in making the determination under the preceding paragraph;
**(3)** If either of the foregoing methods cannot reasonably and fairly be applied, the full-time weekly wage of the injured employee shall be used;
**(4)** If compensation is due for a fractional part of the week, the compensation for such fractional part shall be determined by dividing the weekly compensation rate by the number of days employed per week to compute the amount due for each day;

Change in Condition: When an employee is released by the authorized treating physician to light duty work, Georgia allows the employer/third party administrator to file a WC-104 that gives notice to the employee that the physician has released them to light duty work and even if the employer is unable to provide a job within their restrictions in 52 weeks the benefits change from Temporary Total Disability (TTD) to Temporary Partial Disability (TPD) limiting the number of weeks an employee may receive benefits from a maximum of 400 weeks to 350 weeks from the date of injury. In some instances with higher wage earners the weekly amount is also reduced.

**Georgia statute §34-9-104** (a) 'Change in condition' defined; benefits.
(1) As used in this Code section, the term 'change in condition' means a change in the wage-earning capacity, physical condition, or status of an employee or other beneficiary covered by this chapter, which change must have occurred after the date on which the wage-earning capacity, physical condition, or status of the employee or other beneficiary was last established by award or otherwise.
(2) When an injury is not catastrophic, as defined in subsection (g) of Code Section 34-9-200.1, and the employee is not working, the board shall determine that a change in condition for the better has occurred and the employee shall be entitled to the payment of benefits for partial disability in accordance with Code Section 34-9-262 if it is determined that the employee has been capable of performing work with limitations or restrictions for 52 consecutive weeks. Within 60 days of the employee's release to return to work with restrictions or limitations, the employee shall receive notice from the employer on a form provided by the board that will inform the employee that he or she has been released to work with limitations or restrictions, will include an explanation of the limitations or restrictions, and will inform the employee of the general terms of this Code section. In no event shall an employee be eligible for more than 78 aggregate weeks of benefits for total disability while such employee is capable of performing work with limitations or restrictions. No provision of this paragraph shall be interpreted to prevent a change in

> condition from occurring pursuant to paragraph (1) of this subsection or to prevent an employee from becoming eligible for benefits for total disability should such employee subsequently become totally disabled after exhausting 52 consecutive weeks or 78 aggregate weeks of such benefits while capable of performing work with limitations or restrictions. Whenever an employer seeks to convert an employee from benefits for total disability to benefits for partial disability as provided in this paragraph, such employer may convert the benefits unilaterally by filing a form indicating the reason for the conversion as prescribed by rule of the board.
> (3) For the purposes of calculating temporary partial benefits as contemplated by this Code section, benefits shall be paid as follows:
> (A) When an employee is receiving the maximum benefits allowed under Code Section 34-9-261, the employer shall cause to be paid the employee an amount equal to the maximum benefit allowed under Code Section 34-9-262; or
> (B) When an employee is receiving less than the maximum allowed by Code Section 34-9-261, the employer shall continue to pay the employee the same benefits as provided by Code Section 34-9-261 not to exceed the maximum benefit provided by Code Section 34-9-262.

In all instances PMA should file a WC-104 when an employee is released to return to work with restrictions. However, as this report will document, this was not done in all instances. Even if the employee returns to work, the WC-104 should be filed. Not only does the change from TTD to TPD occur after 52 consecutive weeks, it also applies to 78 aggregate weeks. When an employee returns to work light duty, there is no way of knowing the employee will not go out of work at some point in the future and then the 78 aggregate weeks apply.

Even though the employees are low wage earners and in most instances there will be no reduction in the amount of weekly benefit when changed from TTD to TPD (See 34-9-104 (3)(B)), there is a change in the duration from 400 weeks to 350 weeks maximum. This will assist in resisting a claim for catastrophic designation and also reduce the settlement value.

Change in Condition Continued: In other instances the employer is able to provide employment within the restrictions given by the authorized treating physician and the employee refuses to accept the job. In such instances the Georgia Statute allows the employer/third party administrator to go through the WC-240 process of formally offering the employee the job. If the employee then fails to return to work indemnity benefits may be suspended.

> **Georgia statute §34-9-240** (a) If an injured employee refuses employment procured for him or her and suitable to his or her capacity, such employee shall not be entitled to any compensation, except benefits

> pursuant to Code Section 34-9-263, at any time during the continuance of such refusal unless in the opinion of the board such refusal was justified.
> (b) Notwithstanding the provisions of subsection (a) of this Code section, if the authorized treating physician releases an employee to return to work with restrictions and the employer tenders a suitable job to the employee within those restrictions, then:
> (1) If the employee attempts the proffered job and is unable to perform the job for more than 15 working days, then weekly benefits shall be immediately reinstated, and the burden shall be upon the employer to prove that the employee is not entitled to continuing benefits; or
> (2) If the employee refuses to attempt the proffered job, then the employer may unilaterally suspend benefits upon filing with the board the appropriate form with supporting documentation of the release to return to work with restrictions by the authorized treating physician, the tender of a suitable job within those restrictions, and a statement that the employee did not attempt the proffered job. Under those circumstances, the burden shall shift to the employee to prove continuing entitlement to benefits.

PMA failed to follow or delayed the WC-240 process in some instances. Failing to follow the WC-240 process prevents an affirmative measure to return the injured employee to a job within their work restrictions limiting the amount of indemnity paid. If the employee fails to attempt to return to the job offered in the WC-240 process, indemnity benefits may be suspended.

<u>Change in Condition Continued</u> – Termination of Benefits with Notice: PMA failed to aggressively terminate benefits when an employee was released to return to work without limitations and did not return. There is a requirement to give ten days notice of the termination. You should allow one day for mailing and delivery but no more. PMA gives more notice than required and results in paying benefits longer and an overpayment of benefits.

> **Rule 221 Method of Payment**. (i) (1) Suspension of benefits at any time on the ground of change in condition requires advance notice of 10 days unless the employee has actually returned to work.
> (2) The date of filing with the Board, in the absence of compelling evidence to the contrary, shall be considered the date of notice.
> (3) The date affixed by the Board to Forms WC-2 or WC-2A, in the absence of compelling evidence to the contrary, shall be considered the date of notice.
> (4) When suspending benefits for release to return to work without restrictions, the employer/insurer shall attach to the Form WC-2 a copy of the supporting medical report from employee's authorized treating physician, who must have examined the employee within sixty days of the effective date of the release.

Vendor Management - Private Investigations Surveillance: It is apparent that PMA routinely utilizes private investigators on claims with no valid basis other than their own curiosity that perchance they may discover the employee either working while receiving benefits or doing something that is contrary to their physical limitations. Surveillance is expensive and adds to the expenses on a file.

PMA's utilization of private investigators in the files reviewed is in direct violation of PMA Management Corp. Claims Handling Standards, PMA041293-PMA041316, which reads as follows.

> Section IV Vendor Management:
>
> Vendor management is a critical component of control of loss and expense costs of a claim. All referrals should be made to approved vendors whenever possible. All fees for services must be evaluated for adherence to budget, accuracy and for compliance with terms of negotiated fee management. The Claims Professional is responsible for the management of any vendor utilized. All referrals to vendors should be:
>
> - Timely
> - Accompanied by clear direction which details the reason for referral
> - Cost/budget established and maintained.

Paragraph C of Section IV deals with Private Investigations and says:

> 1) Activity Check. The purpose of an activity check is to ascertain insight into the current lifestyle patters of the employee based on reasonable suspicions the Claims Professional may have regarding the present nature of the claim or extent of the employee's injury and actual physical restrictions. The following are the responsibilities of the Claims Professional utilizing activity checks
>    - Activity checks must be performed prior to any assignment of surveillance in order to justify need for surveillance
>    - An activity check prior to surveillance may be waived if the Claims Professional has reliable information
>    - Activity checks should be assigned as a means to clarify any suspicious elements of the claim regarding the employee's activity
>    - Activity checks must be appropriately assigned and managed in order to monitor expenses
>    - Activity checks must be performed at least once a year on permanent, total, fatal and long term partial claims.
>
> The log notes are to be documented using log note category "Investigation"

2) Surveillance. Surveillance should be initiated on cases where there are questions as to the disability and/or work status of the employee. Any surveillance assignment to a private investigator must be documented in the log notes using log note category "Investigation". All assignments to PI's must include the following:
   - Physical description of employee
   - Clear direction on scope and objective of assignment
   - Provide information on the nature injury and alleged physical restrictions
   - If applicable, date/time/place of upcoming medical appointments
   - Provide private investigator with any prior private investigator reports, if applicable
   - Budget
   - Reporting schedule

   The following are examples of appropriate surveillance assignments versus activity checks:
   - When a previous activity check reveals employee not to be at home consistently between the normal hours of the work day
   - When an informant reports that they know of employee being employed while collecting WC benefits
   - When returning VOE forms and prior activity checks reveal that employee is misrepresenting the current nature of the claim
   - When the physician's assessment of physical capabilities is based upon symptom magnification and/or inaccurate statements from the employee

Of the 88 files reviewed 39 (44%) had surveillance assigned. No claim had an activity check done prior to assignment and no claim note articulated any "reasonable suspicions the Claim Professional may have." No claim fit any example of appropriate surveillance assignments as outlined above. All were assigned simply to see what they may find. In many instances no direction was given to the private investigator other than conduct one or two days of surveillance. The wrong individual was under surveillance in one instance. In another instance surveillance was conducted while the employee was having surgery authorized by PMA and in still another instance two different private investigative firms were hired to conduct surveillance on the same individual at the same time. As a consequence PMA spent a total of $104,430.75 for surveillance on the 39 files without findings to save claim costs for GAOSIF for vendor management.

Penalties/Overpayments: When a penalty is assessed for PMA's failure to pay indemnity or medical benefits timely, the penalty is appropriately paid from the claim file, however, there is no indication that the amount of the penalty is reimbursed by PMA. PMA should be responsible for penalties that are a consequence of their inaction or delay in payment of benefits statutorily due.

All overpayments should be credited by PMA as the third party administrator charged with the proper management of the claims. There is no evidence on the files reviewed that PMA credited the individual files for overpayments or penalties.

Vendor Management Continued - Litigation Management: PMA assigns claims to defense counsel and abandons the claim management to counsel rather than continue to manage issues that an adjuster should be capable of doing therefore saving the legal defense costs.

PMA Management Corp. Claims Handling Standards PMA041293-PMA041316, states:

> Section V Litigation Management:
>
> Effective litigation management is critical to controlling loss and expense costs. The process should be a team effort of both PMA claims and defense counsel to best protect the interests of our accounts and resolve claims promptly, efficiently and properly.
>
> B. Ongoing Management of Defense Counsel
>
> Ongoing management of defense counsel has 4 components:
> - Direction/Coordination of litigation strategy
> - Counsel status reports
> - Budget
> - Insured/client status reports

PMA requires that under B. 1) Direction/Coordination of Litigation Strategy, "All settlement negotiations are to be handled by the Claims Professional unless prior approval is given to counsel. Should the Claims Professional authorize counsel to handled settlement negotiations the file is to be documented with an explanation."

It appears that PMA "Claims Professionals" give prior approval for counsel to negotiate settlements in almost all claims. This is something that can and should be performed by the adjuster to save legal expense costs. In no claim was an "explanation" given for defense counsel's need to negotiate settlements.

PMA requires that under B. 3) Budget, "The claims Professional is responsible for the ongoing management of the budget be reviewed and/or adjusted as appropriate upon receipt of the budget. If Defense Counsel's bills exceed the budget received, direction should be sought from the Claims Supervisor before further bills are paid."

In many instances no budget was received from defense counsel. Where budgets were received and expenses exceeded the budget there was no indication that payment was suspended or that the Claims Supervisor or Claims Professional involved themselves.

Failing to follow PMA's Claims Handling Standards allows legal expenses to increase without management by the adjuster and or supervisor, increasing costs to the client.

An excellent example of PMA's failure to follow their own Claims Handling Standards as it relates to legal budgets is the claim for [redacted] W890938592.

The Claim Handling Standards reference Defense Counsel Guidelines. Two sets of the Defense Counsel Guidelines were provided by PMA. One is not dated, PMA 042944-69, and the other is specifically for workers compensation and is effective January 2009, PMA 042970-84.

The undated version of Defense Counsel Guidelines state it is the responsibility of PMA Management Corporation to "Control litigation costs while maintaining the effective defense of claims, suits and actions" and "Manage the course of litigation." Both state, "All settlement negotiations are to be handled by PMA Management Corp Claims Professional unless prior approval for an alternative plan is given."

Subrogation: Each file contains handling instructions that state, Subrogation should be fully investigated to include an onsite investigation with photos and recorded statement. PMA failed to pursue subrogation within the time limit prescribed by Georgia statute in at least one claim.

> **Georgia statute §34-9-11 (a)** When the injury or death for which compensation is payable under this chapter is caused under circumstances creating a legal liability against some person other than the employer, the injured employee or those to whom such employee's right of action survives at law may pursue the remedy by proper action in a court of competent jurisdiction against such other persons, except as precluded by Code Section 34-9-11 or otherwise. (c) Such action against such other person by the employee must be instituted in all cases within the applicable statute of limitations. If such action is not brought by the employee within one year after the date of injury, then the employer or such employer's insurer may but is not required to assert the employee's cause of action in tort, either in its own name or in the name of the employee. The employer or its insurer shall immediately notify the employee of its assertion of such cause of action, and the employee shall have a right to intervene. If after one year from the date of injury the employee asserts his or her cause of action in tort, then the employee shall immediately notify the employer or its insurer of his or her assertion of such cause of action, and the employer or its insurer shall have a right to intervene. In any case, if the employer or insurer recovers more than the extent of its lien, then the amount in excess thereof shall be paid over to the employee. For purposes of this subsection only, 'employee' shall include not only the injured employee but also those persons in whom the cause of action in tort rests or survives for injuries to such employee.

Subrogation Continued – "Made Whole": PMA failed to understand the "made whole" statute in Georgia regarding subrogation and incurred legal expenses that were not necessary.

> **Georgia statute §34-9-11.1 (b)** In the event an employee has a right of action against such other person as contemplated in subsection (a) of this Code section and the employer's liability under this chapter has been fully or partially paid, then the employer or such employer's insurer shall have a subrogation lien, not to exceed the actual amount of compensation paid pursuant to this chapter, against such recovery. The employer or insurer may intervene in any action to protect and enforce such lien. However, the employer's or insurer's recovery under this Code section shall be limited to the recovery of the amount of disability benefits, death benefits, and medical expenses paid under this chapter <u>and shall only be recoverable if the injured employee has been fully and completely compensated</u>, taking into consideration both the benefits received under this chapter and the amount of the recovery in the third-party claim, for all economic and noneconomic losses incurred as a result of the injury.

Subrogation in Georgia is very difficult due to the statute and case law regarding "made whole". It is prudent to select claims for which successful recovery is possible and utilize the right of subrogation as a negotiation tool to reduce the amount of any settlement by waiving subrogation rather than incurring expenses when the potential for recovery is so small. PMA in at least one claim spent more on legal expenses to make a recovery than they recovered.

<u>Action Plans – Claim Resolution</u>: In many instances PMA's failure to follow their own Action Plans and Supervisor instructions resulted in untimely settlement evaluations and negotiations delaying the final resolution of the claim.

A third party administrator is charged with the responsibility of managing the claim with the goal of early return to work. PMA uses that terminology throughout their file notes, i.e. ERTW (Early Return to Work).

There are multiple instances in which the adjuster failed to follow up with the authorized treating physician once an employee had been to the doctor and missed opportunities to get the employee back to work either regular duty or light duty.

In other instances the adjuster failed to pursue settlement by either soliciting a demand from the employee or the employee's counsel not evaluating the claim or offering an amount to settle the claim to bring it to resolution. Adjusters should evaluate claims for settlement and make settlement offers, not solicit demands from the employee or the employee's attorney.

There are many times that claims are simply not managed for months resulting in prolonged disability and excessive payments. There were many other issues that were identified where PMA failed to properly manage claims resulting in additional costs to the Georgia Operators Self Insurers Fund. A detailed analysis of each claim reviewed follows.

**Conclusion**

My conclusion following review of the 88 files is that there were damages totaling $1,361,721.33 due to the failure of PMA to manage the claims in a reasonable and prudent manner. PMA failed to follow practices and procedures normally followed in the management of workers compensation claims as well as their own Claims Handling Standards, and as a consequence damaged the Georgia Operators Self Insurers Fund.