```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION


 3

    GEORGIA OPERATORS SELF-INSURERS       )
 4  FUND,                                  )
           Plaintiff,                      )
 5                                         ) Civil Action
    -vs-                                   ) No. 1:12-CV-2578-ODE
 6                                         )
    PMA MANAGEMENT CORP.,                  )
 7        Defendant.                       )


 8


 9


10

                     Transcript of the Proceedings
11               Before the Honorable Orinda D. Evans
                           October 2, 2013
12                        Atlanta, Georgia


13


14


15
    APPEARANCES OF COUNSEL:
16
    On behalf of
17  the Plaintiff:                   Kenneth M. Gorenberg, Esq.
                                     Thomas J. Gallo, Esq.
18

19  On behalf of
    the Defendant:                   Paul W. Burke, Esq.
20                                   Eric Rosson Mull, Esq.


21


22


23  Amanda Lohnaas, RMR, CRR
    Official Court Reporter
24  United States District Court
    Atlanta, Georgia
25  (404) 215-1546
```

1          (Wednesday, October 2, 2013, 11:00; proceedings in

2     chambers.)

3          THE COURT:  Good morning, everybody.  How are you?  I

4     would like for the two lawyers who will be doing the most

5     talking to sit in the wing chairs.

6          MR. BURKE:  I think we know who we are.

7          THE COURT:  Let's see, you represent --

8          MR. BURKE:  I represent Defendant, I'm Paul Burke.

9          MR. GORENBERG:  And for the Plaintiff, Ken Gorenberg.

10         THE COURT:  Okay.  Well, why don't the Plaintiff's

11    people sit here?  Sir, are you here for the defense side?

12         MR. MULL:  Yes, ma'am.

13         THE COURT:  Come sit on the sofa right over here so

14    you can see better.

15         MR. GALLO:  I'm Tom Gallo, Your Honor.  I'm with Ken

16    Gorenberg.

17         THE COURT:  Good morning, Mr. Gallo.

18         And you're Mr. Burke?

19         MR. BURKE:  Yes, Your Honor.

20         THE COURT:  I set this conference down because you

21    all made a joint motion for a case management conference.  I'm

22    now aware of the fact that there are a number of pending

23    motions that apparently relate to the case management

24    conferencing, maybe we can take those up too.  Who would like

25    to go first?

1          MR. BURKE:  I think the first motion is, I think in

2     chronological order the first motion is yours, the Motion for

3     Appointment of Special Master, which may nullify or affect the

4     need for some of the other motions.

5          MR. GORENBERG:  I appreciate that, Paul.  And I

6     think, Your Honor, if it please the Court, maybe I'll outline a

7     few, perhaps give you a very quick thumbnail of the case, as

8     well as introduce that motion for the appointment of a special

9     master and identify a couple of the other issues that I think

10    may be worth at least some discussion today if not -- there may

11    be some things we can't resolve today but certainly it may be

12    worth discussing because I think there is a lot of

13    interrelationship of things.

14          So the Georgia Operators Self-Insurer Fund, as laid

15    out in our papers, is a self-insured fund of most of the

16    McDonald's franchise owners in the state of Georgia, and so

17    they self-insure for workers' compensation.  That is the sole

18    purpose for which this entity exists.  And they've contracted

19    with the Defendant, PMA Management Corporation, to be the

20    third-party claim administrator for what turned out to be five

21    years, 2008 through 2012.  And in this case the Georgia

22    Operators Fund contends that PMA mishandled a large number of

23    those claims and caused significant financial damages to the

24    fund.

25          THE COURT:  When you say mishandle, what do you mean

1   exactly?

2        MR. GORENBERG:  It is in essence a professional

3   malpractice allegation.  It is analogous to a legal malpractice

4   but not exactly the same.  We get into questions, such as in a

5   couple of the larger dollar value claims, where our expert,

6   Doug McCoy, our claim handling expert --

7        THE COURT:  Really I'm asking you for a factual

8   description of what they did wrong.

9        MR. GORENBERG:  Yes, I understand.  So among things

10  that we identify as being done clearly wrong, we believe, are

11  they have in their claim files documented instances where they

12  have an opportunity to settle a claim for, say, $60,000 and

13  they have documented in that claim file their own plan to go

14  ahead and settle that claim for at or around $60,000 and then

15  they just don't do it.  And as a result, the claim remains

16  pending and because in workers' compensation, unlike other

17  types of claims, you must continue to pay benefits to that

18  claimant, unlike in many other claims where you don't pay

19  anything until there is a resolution, here you are paying as

20  you go until there is a resolution or until the claimant is

21  back to health and back to work.  So there are continuing

22  damages that accrue because the claim is pending.

23        Plus, if you end up ultimately settling it for a

24  higher amount in net than you would have had you settled it at

25  that time, we contend that that is mishandling by the missed

1    settlement opportunity and the resulting damages.

2            THE COURT:  Let me ask you this with respect to that

3    particular example, did you get any discovery explaining what

4    their side of that is?  What did they say?

5            MR. GORENBERG:  They said basically, through their

6    expert, and to some extent the fact that the fact witnesses

7    were involved and recall, they said things such as, well, the

8    claimant changed attorneys and changed the demand almost

9    immediately thereafter so it wasn't a real opportunity to

10   settle.  Or the expert says, well, if you had even agreed to a

11   settlement there at that instance it would have been rejected

12   by the Georgia Workers' Compensation Board.  So again, it --

13           THE COURT:  Let's leave out the expert and just talk

14   about what the fact witnesses had to say on this particular

15   claim that you're talking about, what the fact witness said.

16           MR. GORENBERG:  The fact witness, as I recall it,

17   Your Honor, did not specifically recall the event but we have

18   seen the Defendant has pointed to a document that's in the

19   claim file, and in a not obvious place, that the Defendant

20   contends shows that they actually did attempt to settle the

21   claim for $50,000 as opposed to the $60,000 demand.  So their

22   position is they made a good faith effort to settle and it

23   really wasn't their fault that the claim didn't settle.

24           THE COURT:  Well, if that's true would that end that

25   claim?  If they tried to settle for 50 and it just didn't work.

1           MR. GORENBERG:  Frankly, I think when we get into the

2    actual facts of the document, first of all, the document they

3    refer to is an attorney lien claim filed by a former claimant's

4    attorney so we don't know if it actually states the real

5    history of what happened.  But assuming that it does, what that

6    document says is that the Defendant had offered $50,000, then

7    received the demand of $60,000.  Then you see in the claim file

8    that demand of $60,000 is documented with the plan to go ahead

9    and complete settlement.

10           So in our view the facts plainly show that they had

11    the opportunity right there and did not act on it because all

12    they needed to do was close the $10,000 gap which they

13    recognized and they didn't do it.

14           MR. GALLO:  Your Honor, I had the opportunity to

15    actually depose the claim handlers for PMA and Eric was on the

16    other side, we were the ones who were going through the detail

17    of it all.

18           Just so you know, the way these matters are handled

19    is whenever the claim handler from PMA takes action in the

20    file, they make a note.  So what you have is you have a running

21    history of everything that was done in the file from beginning

22    to end, or supposed to have been a running history.  In some

23    instances they failed to make notes.  So it's, although it's

24    very detail oriented, it's the kind of thing that you can look

25    through the history and see what was done, and from our

1    perspective, more importantly, what wasn't done in a timely

2    manner.  So it's not purely based on people's independent

3    recollection.  You've got a written timeline that you follow.

4              THE COURT:  In your estimate of damages at this point

5    what are you considering that that particular claim is worth?

6              MR. GALLO:  Ken probably knows.  I think it's around

7    200,000.

8              MR. GORENBERG:  I think it's actually more, more like

9    close to $300,000.  And on the damages --

10             THE COURT:  How would you get to that?  I don't

11   understand.

12             MR. GORENBERG:  So there are actually -- there are

13   two components or two ways of looking at damages.  In this

14   particular claim the roughly $300,000 figure would come from

15   our claim handling expert who, having perused the file, he can

16   point to specific numbers.

17             For example, I mentioned that ongoing payment of

18   benefits to that claimant while the claim remains pending that

19   you wouldn't have had to pay if you had settled the claim on

20   this date but you're continuing to pay it at this point.  Plus

21   the ultimate settlement, which was higher than the amount that

22   could have been settled something like two years earlier.

23             THE COURT:  You said ultimate settlement was --

24             MR. GORENBERG:  I don't remember offhand the exact

25   amount but when you add up these different components, and

1   there's some other more detailed criticisms that our expert

2   has, he points to specific numbers in the claim file and he

3   adds them up.

4           THE COURT:  Do you remember the figures on that, what

5   the actual settlement was?

6           MR. GORENBERG:  I don't, I'm sorry.

7           THE COURT:  Or what amount of benefits were paid out

8   in the interim?

9           MR. BURKE:  That hasn't --

10          MR. GORENBERG:  Oh, that's right, Mr. Burke corrects

11   me, that particular claim we're referring to has not been

12   settled.

13          MR. GALLO:  It's the ongoing benefit payments from

14   the date it could have been settled.

15          MR. GORENBERG:  The other way our expert comes to an

16   estimate of hard dollar damages for that claim is he looked at,

17   in fact, I think it was the last document in the Defendant's

18   file before they turned the claim over to our subsequent

19   handler in 2012, or they had an actual settlement evaluation,

20   so he used their estimate of what the settlement value was at

21   that time.  And he used that as the assumption for calculating

22   damages, which the Defendant's expert actually agreed was a

23   reasonable method for making that calculation.

24           But in addition to that, looking at that as an

25   individual claim analysis and damages component, we have

1     another expert that we are offering which is one of the

2     subjects of one of the motions today, Mr. Costner is the

3     Georgia Fund's actuary, has been their actuary basically since

4     inception of this fund in 1993.  And what he looks at is the

5     historical claim experience and costs for this fund over its

6     entire life and he sees that there is a significant increase in

7     the cost on an annual basis during the time that the Defendant

8     is handling the claims and that's begun to come back down since

9     they are no longer handling claims.  And he says that that

10    total difference, which appears to be somewhere in the

11    neighborhood of 3 to $4 million during that period, cannot be

12    fully explained by factors other than the negligence we contend

13    of the Defendant.

14          THE COURT:  So it sounds like you're saying that PMA

15    was not aggressive enough in handling these claims.

16          MR. GORENBERG:  That is a very good summation of the

17    point, Your Honor.

18          MR. GALLO:  What we found in deposing the claims

19    handlers and the supervisor for the claims handlers was part of

20    the problem, we think, arose because the Atlanta office was

21    relatively small, the PMA Atlanta office was relatively small

22    but their salespeople were doing a great job.  They were

23    bringing in a lot of claims and a lot of business but the

24    claims handling staff was kind of overwhelmed with it.  They

25    were continuing to get new claims from new clients and just had

1    too much to do.

2            THE COURT:  On what basis was PMA paid for the work

3    they did?

4            MR. GORENBERG:  They were paid primarily on a fixed

5    dollar amount on a per claim basis based on the categorization

6    of the claim under a number of different categories, whether it

7    involves lost time the employee is out of work and receiving

8    wage benefits as opposed to medical only, meaning they are only

9    receiving medical treatment, and there are a couple of

10   subcategories in addition to that.  There are some other

11   additional fees for certain other services they may provide but

12   that's the core, the thrust of most of the fee payments.

13           THE COURT:  So it was basically a set fee structure

14   based on the relative degree of complication of the individual

15   claim?

16           MR. GORENBERG:  Again, a fair summarization of it,

17   Your Honor.  That's not, of course, the total expense that our

18   client incurs on each of these claims because then, for

19   example, if the Defendant needs to hire counsel to defend the

20   claim, the attorneys' fees incurred there are charged to the

21   file and then ultimately paid by the Plaintiff, by the Georgia

22   Fund.

23           And one of the things that's really important about

24   this as well, Your Honor, is that all of the day-to-day

25   payments, whether it's to outside counsel, whether it's to

1    surveillance, whether it's to medical providers, whether it's

2    direct payment of benefits to the claimants, the Defendant

3    takes that money directly from an account funded by the

4    Plaintiff.  And that's perfectly okay, that's the way these

5    kinds of things are structured and it's under the agreement,

6    there is a bank account that we fund and they sweep it as they

7    need and they come to us from time to time and say we need more

8    money.  Frankly, that's part of what happened here, is we were

9    really surprised they suddenly needed more money than we had

10   historically believed was necessary.

11        THE COURT:  One thing that strikes me is it might be

12   difficult at trial to just prove your case based on expert

13   witnesses.  I mean, you've got logs that were made out by the

14   various people who were handling the accounts and it looks to

15   me like you would need to have a foundation evidence from those

16   people.  I don't see this as a case where you can just call

17   your experts and they'll take the logs and say, well, I think

18   this and that.

19        MR. GORENBERG:  Well, Your Honor, it's a very fair

20   observation.  I think we would certainly anticipate there to be

21   some fact testimony from both sides and certainly I think that

22   the actual adjusters who handled some of these claims would be

23   called at trial.

24        I would hope that as far as admission of the logs and

25   other documents in the case, that that would be something that

1   could be stipulated as business records that would create the

2   foundation for further testimony by the experts.

3         But I think Your Honor is also now speaking to some

4   of the issues that really lead us to our motion for appointment

5   of a special master because this is a case that the nature of

6   this kind of a case is one that is very difficult to litigate,

7   least of all try, in a very efficient and cost-effective

8   manner, and the special master concept seems to be one that

9   would be very helpful to the parties and the Court in allowing

10  for a more efficient way of approaching the case, perhaps

11  taking it in bites.  Among other things, one of the prime

12  potential benefits of a special master process that starts with

13  a subset of the claims, a relatively small subset of the claims

14  and results in findings of facts on --

15        THE COURT:  Have you all agreed on a representative

16  subset?

17        MR. GORENBERG:  We have not.

18        MR. BURKE:  That's one of the problems.

19        MR. GORENBERG:  I believe that the Defendant is not,

20  certainly not opposed to the idea of a special master.  I think

21  we probably need more to discuss some of the parameters of it

22  but the ultimate benefit that I think both parties recognize is

23  that it provides at least, I think, two potential benefits.

24        One is the possibility that after findings of fact

25  are made on a subset of claims it very well, hopefully, would

 1   help the parties see where this case is going and possibly

 2   result in settlement of this case, which the parties have tried

 3   many times in several ways but have not succeeded.

 4        THE COURT:  Wouldn't the special master have to take

 5   testimony from all of the representatives who handled these

 6   claims?

 7        MR. GORENBERG:  Not necessarily all of them, Your

 8   Honor, and there really are not very many, anyway.

 9        THE COURT:  Not that many claims?

10        MR. GORENBERG:  I'm sorry, not that many claims reps,

11   that's right.  There's one adjuster who handled the vast

12   majority of the claims for the vast majority of the time at

13   issue.  She had one supervisor for the vast majority of time at

14   issue.  There was one other supervisor.  I think on the

15   Defendant's side there are probably no more than three or four

16   people who would have important testimony in that type of an

17   exercise.

18        THE COURT:  Now, the person who handled the vast

19   majority of the claims, have you taken her deposition?

20        MR. GORENBERG:  Yes, Mr. Gallo did.

21        MR. GALLO:  Ms. Connie Mabry.

22        THE COURT:  And did you get a lot of information that

23   was helpful?

24        MR. GALLO:  Yes, we did.  That's where we found --

25   one of the issues we had is -- PMA is a reputable company --

```
 1   why were we having these problems, and we didn't really know,
 2   we couldn't tell.  And when I asked Ms. Mabry about it I said
 3   did you have problems keeping up and she said yeah.  I said
 4   what did you tell your supervisor.  She said I told them that
 5   my workload was killing me.
 6          So that's the kind of testimony we got from
 7   Ms. Mabry.  She's a wonderful lady, I think she is very
 8   capable, she just found herself in a position where she had too
 9   much work to do.
10          THE COURT:  With respect to her overload, how would
11   you characterize your claim against the Defendant?  What kind
12   of claim is it?
13          MR. GALLO:  In essence I think there's breach of
14   fiduciary duty, if the Court agrees there is a basis for a
15   fiduciary duty claim, and we've briefed that.
16          THE COURT:  I don't know.
17          MR. GALLO:  Negligence and breach of contract.
18          THE COURT:  Okay.  And I bet you there's nothing in
19   the contract that really pertains specifically to her overload,
20   true?
21          MR. GORENBERG:  That is true, Your Honor.
22          MR. GALLO:  Nothing express.
23          MR. GORENBERG:  Right.  So from our perspective the
24   overload in and of itself, it's merely an explanation for her
25   failure to do the job that she was, I believe Mr. Gallo is
```

```
 1    correct, capable of doing the job but anybody is going to be
 2    deficient if they have too much to do.
 3              THE COURT:  Would there be a basis for a negligence
 4    claim?
 5              MR. GORENBERG:  Yes, absolutely, absolutely.  That is
 6    really, as I said, I think this is in essence a professional
 7    negligence claim.  There is, of course, a written contract
 8    between the parties so we have the breach of contract action as
 9    well.  They are -- the damages would be the same under any of
10    these causes of action with the exception that if the Court
11    does find that there's a fiduciary duty and that it was
12    breached then there would be the potential for punitive
13    damages.  But the compensatory damages are the same under any
14    of these causes of action.
15              THE COURT:  Do you all concede there would
16    potentially be a cause of action for breach of contract and
17    negligence?
18              MR. BURKE:  We think there is a clear action for
19    breach of contract, Your Honor; we do not concede there's
20    action for negligence and that's part of the motion for summary
21    judgment we've already filed on the questions of negligence,
22    breach of fiduciary duty, and punitive damages, we think this
23    is all embraced in contract.  They're saying we did not perform
24    under the contract and, candidly, I don't think you're going to
25    get much dispute from my client as far as did they do the job
```

1    that they themselves would have liked to have done, no.

2         We've always approached this as a "so let's get down

3    to the damages."  Let's look at it, and that's where we just

4    fly apart.  This didn't go wrong all at once.  There's quite a

5    history of efforts to repair it.  So we have my clients very

6    candidly and forthrightly saying, yes, we need to be better on

7    this, let's try this, let's try that fix.  Some things worked,

8    some things didn't work.  Some things the damage is already

9    done as far as the faith in each other.  You know, I think they

10   have lost confidence in us and want to move on to another TPA,

11   so there's going to be evidence of a breach of contract and

12   there will be evidence of efforts to come up with a number and

13   that's where -- that's how we ended up here.

14        THE COURT:  Right.

15        MR. BURKE:  Our expert produces a number that he

16   thinks, you know, is going to be much less, it's in excess of a

17   hundred thousand dollars that he can find going through and

18   finding damages.  But I think that's where the special master

19   idea gets traction, is, you know, it is -- I will come

20   alongside Ken and agree, and with the Court, I think that this

21   gets very difficult in a courtroom.

22        The case that we end up discussing as an example,

23   Sherman Bell, that just has one adjuster, Connie Mabry, but

24   it's an ongoing case.  The witness, the obvious witness is

25   Sherman Bell.  Mr. Bell, would you have taken $60,000 at this

1    point?  This case is still ongoing.

2            And I don't -- it gets very confusing as to how you

3    manage that type of testimony and then when you start

4    multiplying that, you know, there are not that many cases

5    dealing with this particular claim, there's only a handful of

6    claim cases.

7            MR. GALLO:  That few -- few of the claims amount to a

8    good bit of the money damages, at least with respect to the 88

9    claims that have been studied by the experts.

10            THE COURT:  What kind of claims?

11            MR. GALLO:  I think there's two or three of the 88

12    that --

13            THE COURT:  Oh, 88, I'm sorry, I thought you said

14    ADA.

15            MR. GALLO:  88 claims that our expert reviewed in

16    great depth and Paul's expert reviewed in great depth and when

17    you -- our expert came up with a million three in damages as a

18    result of that.  Four or $500,000 of that million three is

19    attributed to two or three of the claims of the 88, just to

20    give the Court an idea.

21            THE COURT:  How much?

22            MR. GALLO:  Four to 500,000; is that right, Ken?

23            MR. GORENBERG:  Right.

24            MR. GALLO:  Arises from two or three of those claims

25    of the 88 that were analyzed.

1      MR. BURKE:  The point I was making is that point but

2 also not all of the claims are a failure to settle timely

3 claim.  There's really only maybe five or six, I think, failure

4 to settle timely, maybe more than that.

5      THE COURT:  The big claims, what kinds of claims are

6 they?

7      MR. BURKE:  Failure to settle.

8      MR. GORENBERG:  Your Honor, I think, again I don't

9 mean to step on Mr. Burke's toes because I think we really are

10 on the same page about the concepts here and maybe what may

11 help Your Honor is to hear from us that failure to settle is an

12 issue that appears in a handful of claims but any individual

13 claim may have several different issues that we contend are

14 examples of the mishandling that amount to damages.

15      But I also believe that there are probably only five

16 or six issues that we tend to see in most of these claims and

17 it would therefore, I believe, not be difficult for the parties

18 to come up with a representative sample of the claims, to then

19 in essence try to a special master these concepts and get

20 damages applying those concepts to the specific claims.

21      THE COURT:  But you wouldn't -- I know I guess I'm a

22 little skeptical that you would really be trying the concepts.

23 I mean, you would have to put in evidence on each one of the

24 claims.

25      MR. GORENBERG:  Absolutely, Your Honor.  What I mean

1    by trying the concepts is, again, we use failure to settle

2    because it's something we talked about and it's fairly easy to

3    understand.  We obviously have different perspectives on the

4    opportunity that we believe existed in the Sherman Bell claim

5    but the basic factual scenario there is not entirely different

6    than the factual scenario in some of the other claims we say

7    are failure to settle.

8         So if we were to hear from a neutral party such as

9    the special master as to whose theory on that is correct as

10   applied to a few particular claims, I think the parties would

11   both be able to see where the case is going and what would

12   likely happen if we were to undergo the same exercise on other

13   claims.  And, again, I think that ideally that would put the

14   parties in a better position to resolve the case between

15   themselves but, if not, at worst we would be in a better

16   position to chart the future course of litigation.

17        THE COURT:  Have you all talked about who the special

18   master would be?

19        MR. GORENBERG:  We proposed three names.  I believe

20   that Mr. Burke recognized a conflict with one of them.  I don't

21   know if there were any issues with the other two that we

22   suggested.

23        MR. BURKE:  I have no -- I have complete confidence

24   we will be able to agree on a special master.  We're talking

25   the same ballpark.

1      My issue is actually more, ironically, in protection

2  of the fund because Drew Eckl Farnham is a very large presence

3  in the Georgia workers' comp community and has been for 30

4  years.  We have former board members as partners, we have

5  former AOJs as partners, we have Rick Thomas, the former head,

6  is a former partner, one of the names posed.  I just want to

7  clear the names they suggest to make sure my partner isn't

8  going out to lunch with that person on a regular basis.

9      I think we can find -- I have no concerns that we

10  will find somebody fairly quickly that we will both agree on

11  because we agree on where to look and there's an obvious place

12  to look:  former board members, people mutually respected on

13  both sides.

14      THE COURT:  And you think a proper size group of

15  claims would be how many?

16      MR. GORENBERG:  We suggested in our motion a total of

17  ten claims with each side picking five.  That is not -- it's

18  not a totally arbitrary number but it's also not a number we

19  are wedded to.  It's a thought of how to, again, bite off a

20  relatively small, manageable piece of that case to give us a

21  representative sample and allow us to, on both sides, evaluate

22  where the case would head if there were -- if we were to do

23  this more.  If the Defendant believes we should include a

24  little bit larger sample we would be amenable to, not much

25  larger but somewhat more.

1          MR. BURKE:  Here is where we don't agree and this is

2    where it comes down to for us, and this is a solvable problem,

3    we disagree on the sample size from an efficiency point of

4    view.

5          THE COURT:  You mean you think it should be smaller?

6          MR. BURKE:  Larger.  There's both experts, looked at

7    88 claims, maybe somewhere around 20 of those are meaty, very

8    exhaustive, difficult claims that would require witnesses, fair

9    amount of witnesses.  There are a number of them, though, I

10   think the majority of them are small disagreements where I

11   think the evidence could be stipulated to a special master very

12   simply, wouldn't require testimony, could almost be submitted

13   on the experts, what's already there on those.

14          I think it's inefficient.  You're there, you've got

15   the structure, the parties have already identified 88, I've

16   looked at 88, I don't think it's that much more to just go

17   ahead and do the 88.  I think the bulk of them are going to be

18   about 20 of them.  The rest I suspect we'll stipulate going

19   forward on the expert, look at our expert, look at your expert,

20   make a determination.  It seems unwieldy to do ten, try to

21   settle it, do another ten.  It seems like we're there, created

22   a structure.  We've already in many ways selected the sample

23   size.

24          The other issue I have is, in the other motion, this

25   all works unless they then come in and say but the number is

1  still three to $4 million because of our actuary, the expert

2  we've got, whole different theory, whole different universe,

3  apples and oranges between the people that looked at the claims

4  versus his approach.

5          So I'm confused as to what we do if we go through the

6  special master process, either the full amount or some lesser

7  amount, we come to a number and then they say but, okay, it's

8  still three to $4 million.

9          THE COURT:  What assumption would the special master

10 make about whether there is a cause of action for negligence or

11 would that be a matter submitted to the special master?

12         MR. BURKE:  We would propose, and we discussed this

13 briefly, that the Court actually address -- that the breach --

14 the special master focus on damages found in the claims.  The

15 issue of whether or not there's -- that constitutes negligence

16 which gives rise to punitive damages, what I think, as you've

17 outlined, and it makes sense to me --

18         THE COURT:  Well, just plain negligence would not

19 give rise to punitive damages but I'm thinking more basically

20 along the lines of is there a cause of action for negligence

21 and you all --

22         MR. BURKE:  We briefed that.  We don't believe there

23 is.

24         THE COURT:  I know you said you didn't think so and

25 you all do think so.

1          MR. GORENBERG:  We do.  And, of course, our date for

2    responding to the motion for summary judgment is coming up in a

3    couple of weeks.  I don't disagree that the Court should decide

4    that there was fundamental legal issues and that the special

5    master really should be, in essence, making findings of fact.

6    Perhaps there may not be even great disagreement between the

7    parties about -- I know that the phrase "standard of care" is

8    going to sound loaded as denominating negligence and therefore

9    advocating for our position but what it takes to either breach

10   the contract or permit negligence or otherwise mishandle a

11   claim, I don't think that the basic concept of whether -- of

12   what standards the special master should use would be a matter

13   of great disagreement between the parties.

14          So once we are in that position and the special

15   master is making factual findings as to whether a claim was

16   mishandled and, if so, what are the damages that flow from

17   that, that the Court then would overlay, or vice versa, the

18   legal underpinnings for the causes of action that are

19   actionable as a result of that.

20          I also think that the special master could entertain

21   this other theory of damages that we have with our expert, our

22   other proposed expert, the actuary.  Again, I think a special

23   master, who is by definition, by agreement of the parties,

24   someone who is going to be very well experienced and steeped in

25   the work of workers' compensation work, would understand the

1    concepts that our actuary would articulate and that potentially

2    a rebuttal expert from the Defendant would put forth and the

3    special master I think would be able to make recommendation to

4    the Court as to whether that theory of damages would be

5    acceptable.

6             And to explain that theory of damages a little bit

7    more, Your Honor, it is taking the notion that the claim

8    handling experts on both sides are at their core liability

9    experts rather than damages experts.  They do, as Mr. Burke has

10   also recognized, they do both attempt to make on a per claim

11   basis hard dollar calculations based on what they can actually

12   see in the file.  But what the actuary has done is to say,

13   look, I'm not a claim handling expert, I don't know if claims

14   were handled well or not, that's not my area; what I know is

15   how the overall numbers for this program have developed over

16   time and I, as an actuary, my job is to project what's going to

17   happen in the future based on what's happened in the past.

18            So he says, first of all, during the time the PMA was

19   handling the claims, the losses far outstripped my prior

20   projections and I can't explain why other than because someone

21   is telling me that perhaps PMA was mishandling the claims.  So

22   he's not saying whether they did or did not, he's just saying

23   it's clearly a much more expensive program during the time that

24   PMA is handling the claims.

25            So in essence we then ask a finder of fact, whether

1   it's the special master, jury, whoever ultimately makes the

2   findings of fact, to connect the dots from the liability

3   expert, the claim handling expert, to the actuary who says and

4   here is how much more this program has cost over time.  And I

5   think that undoubtedly PMA, being a subsidiary of an insurance

6   company, they have lots of actuaries that they can find and

7   they have already in fact during even the course of the parties

8   doing business together responded to contentions from the

9   Plaintiff about the increased cost.  They are well capable of

10  analyzing this theory, rebutting it the way they feel is

11  appropriate.  And, again, I think that's something that a

12  special master would be able to really make a lot of helpful

13  recommendations if not --

14          THE COURT:  It strikes me that for a special master

15  to do a good job on what you're talking about, the special

16  master would have to hear a lot of evidence.  It wouldn't be,

17  by any means, limited to expert witnesses.  I think it would be

18  a very expensive proposition to both sides.  They do charge, of

19  course, and so there's the special master's time and your all's

20  time.  I mean you're talking about a lot of money.

21          MR. GORENBERG:  Your Honor, I don't disagree with

22  that, and that is, again, one of the fundamental challenges of

23  this case is it is expensive to litigate.

24          THE COURT:  I can see that.  Just from the way you

25  described it I can see how expensive it would be to litigate

1    and it sounds to me like, you know, you all have done a good

2    job in developing the case.  I don't know whether you have all

3    the information you need from all the claims handlers, I'm not

4    sure about that.  But it seems a very fact-intensive case.  I'm

5    somewhat skeptical of the value of expert witnesses on this.

6    Now, you have -- you had a mediation with somebody, I forget,

7    Kenneth somebody.

8              MR. BURKE:  Kendrick.

9              THE COURT:  And that just didn't pan out.

10             MR. GORENBERG:  It did not.  And Mr. Burke and I have

11   had several more conversations, we do have a good working

12   relationship.

13             THE COURT:  I can tell that, I can see that, it's

14   very good.

15             MR. GORENBERG:  It is.  I think we both appreciate

16   that and I think that the mediation clearly did not go the way

17   either side wanted.  To be perfectly candid, and at the risk of

18   putting things on the record that perhaps somebody wouldn't

19   want to see, I think if this were left to just Mr. Burke and

20   myself we might be able to -- we might have been able to

21   resolve this case some time ago.

22             And I don't mean to place blame at either parties'

23   foot but I think there has been some fundamental

24   misunderstandings between the parties as to positions that

25   they've ultimately taken.  I don't -- I am confident that my

1   client never understood the Defendant's position to be as

2   generous as perhaps it was at some earlier stages and we might

3   not even have to be sitting here today if there had been that

4   understanding.  I can't guarantee that we would have been able

5   to resolve it under any of those circumstances but it's part of

6   that experience and, again, the good relationship that

7   Mr. Burke and I have that leads me to continue to look for ways

8   that we can help bring the parties closer.

9          And that's part of why I still think that the special

10  master concept can be helpful, because, yes, Your Honor, it

11  definitely would be expensive but I think it still would be a

12  fraction of the cost of litigating this case in the traditional

13  manner all the way to the end.  And I think there again is one

14  of the reasons why a subset of the claims is the more efficient

15  and cost-effective way to approach this case, because that can

16  be done perhaps in a two- or three-day mini trial as opposed to

17  what could be a two- or three-week traditional trial.

18          THE COURT:  You're saying ten claims but I hear the

19  Defendant saying not necessarily ten claims.

20          MR. BURKE:  Yeah, I understand Ken's concept.  My

21  whole position is about logistics and infrastructure.  Once

22  you've got this set up I feel like a lot of the expense is

23  going to be spent, you know, I think it's probably closer to 20

24  seriously contested claims, so that would be sort of my floor,

25  or ceiling, whatever, but I think there are about 20 of them.

1   The other ones, I think the remaining 68 fall quickly in
2   comparison to those 20 and so I'm --
3           THE COURT:  When you say fall quickly, you mean they
4   fall quickly or --
5           MR. BURKE:  No, no, no.  Just as far as, Your Honor,
6   what I envision, and maybe I'm being a bit Pollyanna-ish on
7   this but, to a special master, on this we agree, that we both
8   stand by what the experts said, we both stipulate to the expert
9   reports on a number of these, pick between the two experts.
10          THE COURT:  I thought the experts didn't agree.
11          MR. BURKE:  Well, that would be for the special
12  master to determine.  Rather than bringing a lot of witnesses,
13  what I'm saying is for many of these I don't anticipate the
14  cost would make sense to bring in the claimants, the other
15  attorneys.
16          THE COURT:  So you all would just agree to submit the
17  experts' --
18          MR. BURKE:  I suspect --
19          THE COURT:  -- opinions.
20          MR. BURKE:  On a number of them, I suspect.
21          MR. GORENBERG:  And also, Your Honor, I'll be
22  interested to hear what Mr. Burke has to say about this, but to
23  respond to another point that Your Honor made, I don't know
24  that we need a lot of fact testimony because there really is,
25  for the most part, the claim files, again they are supposed to

1    be a record of everything that happened in the claim.  They're

2    not perfect, they never are, we recognize that, and so

3    sometimes you do need a little bit of fill-in.

4              But for the most part everybody is working on the

5    same set of facts.  There's not a significant disagreement

6    about what happened.  The question is did --

7              MR. BURKE:  The impact.

8              MR. GORENBERG:  What was the impact, was it wrong and

9    was there a financial impact from what happened.

10             MR. BURKE:  I don't disagree with that.

11             MR. GALLO:  Can I add one other point that might fill

12   in the puzzle?

13             Your Honor, in the workers' comp area and with a

14   company like PMA, they have very specific claims handling

15   standards and procedures that are published.  For example, once

16   a claim comes in the employer is supposed to be contacted

17   within 24 hours, the employee is supposed to be contacted

18   within 24 hours, and the doctor is supposed to be contacted

19   within 24 hours.  So what you have here is you have the written

20   record of what was done.  You have the written standards that

21   are applicable to the accounts and I don't think there's a

22   dispute about those standards being --

23             MR. BURKE:  Those are part of the contract.

24             MR. GALLO:  Those are part of the contract.  So you

25   have -- and I'm talking very specific standards that are

1   generally applied to all the PMA contracts.  Then you have even

2   an addendum that has certain specific standards and things to

3   be done with respect to our particular account.

4           THE COURT:  So that's the way those 68 claims would

5   be resolved, they just didn't measure up to what their

6   published standards are?

7           MR. GALLO:  The published standards, as well as

8   what's generally recognized in the workers' compensation field,

9   what is supposed to be done and when, when certain things

10  happen.

11          THE COURT:  That sounds logical.

12          MR. GALLO:  There are a lot of very specific

13  standards that everybody recognizes.

14          MR. BURKE:  I agree with that and where the rubber

15  hits the road, where the special master would come in, because

16  it's going to be yes or no whether or not we contacted some of

17  them within 24 hours, it's going to be there or not, so that

18  would be a breach or not, damages.

19          MR. GALLO:  The question is what damages flowed from

20  the failure to meet specific standards in any one particular

21  case.  And sometimes the damage gets down to $300 because they

22  failed to file a form and maybe will punish, penalty from the

23  state.

24          THE COURT:  You all would have the burden of proof on

25  that.

1          MR. GALLO:  Right.

2          THE COURT:  Something like a penalty imposed by the

3     state, that would be easy to prove.

4          MR. GALLO:  There's some of that.

5          MR. BURKE:  Those are conceded for the most part.

6          MR. GALLO:  This may be because they conceded a

7     hundred thousand dollars worth of damage already so there are

8     some concessions.  I don't think it was expressed that there

9     really are written guidelines and standards that these workers'

10    comp experts evaluate the file against and, for example, a jury

11    would be evaluating the file against if we went that route,

12    which sounds --

13         MR. BURKE:  And to follow what Tom's saying, the kind

14    of special master we're looking at, these standards are not

15    unique, these are all over the industry for the most part in

16    some form or another, maybe a little tweak, so --

17         MR. GALLO:  In some --

18         MR. BURKE:  -- special master would be very familiar

19    with.

20         MR. GALLO:  In some respects, Your Honor, there's

21    statutory and regulatory standards that are imposed by the

22    Workers' Compensation Board so they're legal standards, not all

23    of them but some of them.

24         MR. GORENBERG:  Also, in speaking to the background

25    and expertise of any special master we would choose as a

1     special master, I think would therefore be able to approach all

2     these things very, very efficiently.  They understand these

3     concepts immediately so you don't have to take quite as much

4     time as you would, certainly, with a jury, where you have to go

5     from square one and explain to them this is what workers'

6     compensation is about.  The special master can cut right to the

7     chase very much like an arbitration where you get the right

8     kind of arbitrator who can go right to the heart of the matter

9     and move the parties along in their testimony.

10          MR. BURKE:  You've had different experiences than me.

11          MR. GORENBERG:  The right arbitration, the right

12     arbitrator, the way arbitration is supposed to go.  I think the

13     special master -- again because we clearly are on the same page

14     about who we would want to use for that and some of the -- and

15     what you would do once you get to the agreement on the claims

16     and I think it would be much more efficient than a trial.

17          THE COURT:  Well, that might be true.  I wonder

18     whether it might be more efficient, I mean, I don't know, I

19     wasn't at your mediation so I don't know how it went, but there

20     are lawyers in Atlanta who specialize in working with parties

21     on trying to get settlements together.  There's a guy that left

22     King & Spalding, I don't even know, he's in -- lived in Macon

23     the last I knew.

24          MR. BURKE:  I think I know who you are talking about.

25          THE COURT:  He may be deceased now but he was very

1   good at doing tough settlement conferences, I guess you would

2   call it.  And then there's a man at Rogers & Hardin who has

3   done that successfully.  I don't know whether, you know, this

4   particular type of case but --

5           MR. GALLO:  He does a lot of employment-related cases

6   I think.

7           THE COURT:  You might be right about that.

8           MR. GALLO:  I'm drawing a blank on his name but he's

9   done a lot of big high-profile employment cases.

10          THE COURT:  Correct.  That kind of person I think

11  would be less expensive, maybe not inexpensive but a lot less

12  expensive than a special master.  I still think that's an

13  expensive way to go.  I mean, it's tempting to do it because

14  both of you all agree on it.

15          MR. BURKE:  Which is rare.

16          THE COURT:  But you're going to be surprised at

17  how --

18          MR. GORENBERG:  Well, Your Honor, again, not pulling

19  any punches here, I don't want to have to go that route if the

20  Court is suggesting another run at settlement with someone who

21  may be more effective in bringing the parties together.  If it

22  can be done, by all means.  We've never really wanted to

23  litigate this case, we've always wanted to settle it.

24          THE COURT:  I think that would be a better route.  My

25  understanding, the kind of thing that goes on at those

1    conferences is that the person conducting them would talk to

2    you all separately and together to try to get some sense of

3    where you're coming from and where you might be amenable to

4    settle.

5            MR. GORENBERG:  And, again, I don't know exactly why

6    we weren't able to have more effective communication at the

7    previous mediation but I'm absolutely amenable to the idea of

8    we, perhaps we put the brakes on the litigation for a little

9    while and make another run at this, especially if the Court has

10   in mind someone with a better track record, or at least someone

11   the Court feels more confident in, perhaps with an appropriate

12   order from the Court about what this type of settlement

13   conference looks like and the authority that needs to be

14   brought, things like that so -- and a stronger commitment to

15   staying at it.

16           THE COURT:  Now, the other thing I can offer you, and

17   I don't know whether this will work, our magistrate judges do

18   settlement conferences and, of course, that doesn't cost you

19   anything.  And sometimes they are effective.  I think both of

20   you all are very, as, you know, probably you should be as

21   conscientious lawyers, you're very deep into the details on

22   this case and you want an outcome that you can justify with

23   maybe more mathematical certainty than is ever going to happen.

24   You'd love to be able to go to your clients and say, well, you

25   know, so-and-so has analyzed these claims and this is the right

1   approach and this is what we need to do.  You want to justify

2   it to a great degree of certainty with your clients and I'm

3   skeptical you're ever going to get to that point.

4            MR. BURKE:  Right.

5            THE COURT:  I think you might even come out better by

6   rolling the dice or flipping some coins in terms of saving your

7   clients' money.

8            MR. BURKE:  You know, I know better than to ever say

9   no, I don't want to talk settlement anymore because, of course,

10  that is the best possible result.  My very candid concern is

11  there will be a sticking issue that could derail it, which will

12  be the new expert.  We don't know what universe we're playing

13  in, playing in a $1.3 million universe or $3.4 million

14  universe.  That's going to make it hard.

15           THE COURT:  I'm skeptical about the new expert, I'll

16  tell you that.  I have the list of your motions and it looks to

17  me like this gentleman is somebody who essentially has been on

18  board the whole time.  So I'll tell you I'm skeptical about

19  that.

20           MR. GORENBERG:  I understand, Your Honor, and, of

21  course, a lot of what we tried to explain in our response is

22  that that's simply an issue that would not really need to be

23  decided at this stage of the case, anyway.  There's no

24  prejudice.  There would be no prejudice to allowing discovery

25  on that expert to move forward.  The Court could later

1    determine --

2              THE COURT:  Well, the way I'm looking at it is we're

3    getting close to the end.  That's the way I'm looking at it.

4              MR. GORENBERG:  I understand, Your Honor, but I think

5    more importantly, getting into the dynamics of any further

6    efforts at settlement, I certainly understand Mr. Burke's

7    concern about that issue, it's a real one, one that at a

8    minimum could be presented to any mediator or settlement

9    conference coordinator to suggest what the outcome on that

10   issue might be.

11             The flip side that I need to be candid about, and

12   Mr. Burke is well aware of, is that because, largely because

13   the last mediation did not succeed, the cost of litigation went

14   up dramatically and it is very difficult for the Plaintiff in

15   this case to just eat that expense.

16             THE COURT:  Right.

17             MR. GORENBERG:  So, yes, the number, it's a lot

18   harder for the Plaintiff to move down given the additional

19   expense that's been incurred so far.

20             THE COURT:  I'm going to rule on some of these

21   motions that are pending.

22             There is, I'm going to skip over the motion for the

23   special master at this point but there is a motion filed by the

24   Defendant to amend the answer to the complaint.  That's denied.

25             There is a motion by the Defendant for permission to

1   file a response to Plaintiff's reply regarding motion for

2   appointment -- I'll just skip over that.

3        MR. BURKE:   Thank you, Your Honor.

4        THE COURT:   There is a motion by the Defendant to

5   strike or exclude the Plaintiff's late-identified expert.   I'm

6   going to grant that.

7        There is an amended motion to strike Plaintiff's

8   late-identified expert.   That is granted.

9        There is a motion to exclude PMA's expert John

10  Saulino and I'm going to grant that too.

11       Now, I think it does make sense to -- for me to rule,

12  not right now, but on the motion for partial summary judgment

13  which was filed on the 23rd and, I don't know, you said you all

14  haven't filed anything yet.

15       MR. GORENBERG:   It hasn't come due yet, it has not

16  come due yet.   I will say, Your Honor, based on your most

17  recent ruling granting our motion to exclude Mr. Saulino,

18  that's going to have a very significant impact negatively for

19  the Defendant on all aspects of this case.   So that will, among

20  other things, affect the response that we file to the motion

21  for summary judgment.

22       THE COURT:   Okay.

23       MR. GORENBERG:   And I think it will affect the

24  settlement dynamics as well, as it would lots of other dynamics

25  if this case moves forward in any respect.

1          THE COURT:  I'm going to suggest to you that you talk

2     to one of our magistrate judges.  I think that's a logical next

3     step.  Now, there's no motion to extend discovery, right?

4          MR. BURKE:  No, Your Honor.

5          MR. GORENBERG:  Nothing specific.  We did, as a

6     result of these other motions suggest, and we identified --

7     there is at least one remaining issue which I don't know is

8     going to be crucial but there were some additional documents

9     that the Defendant identified and produced right in the last

10    couple of weeks of discovery and neither side has really been

11    able -- had a chance to fully digest them.  I don't know if

12    that's going to require any further discovery.  It may, at

13    worst, perhaps entail a very brief supplement of our expert's

14    report.

15         If Mr. Burke wanted to take a limited further

16    deposition of him on that basis, for example, I would be

17    perfectly amenable to any of those really minor relatively

18    brief efforts that the parties may jointly think are

19    appropriate to --

20         THE COURT:  Well, I'll just leave that up to you all.

21    The way we work it with the magistrate judge conference is I

22    will notify the chief magistrate that we want a magistrate

23    judge to be selected to handle it and whoever's next up on

24    their rotation list will get it and that magistrate judge will

25    let you all know that he or she has been selected and to call

1    chambers to set up a time for it.

2            If that does not work out, and the magistrate judge

3    will tell me as soon as the conference is over whether the case

4    has been settled, he or she will not tell me anything about

5    how, you know, what happened in the conference other than it

6    settled or it didn't settle.  If it doesn't settle then I'll

7    talk to you all again about a special master.  But I'll tell

8    you I'm so skeptical that that's going to work well for you and

9    I really think if we get to that point you might be better

10   served by trying to pick a lawyer that you have confidence in

11   who will spend a lot of time with you on your case.

12           Anything else for today?

13           MR. GORENBERG:  No, Your Honor.  I think this has

14   been a very helpful session, really appreciate your comments.

15           MR. GALLO:  Thank you very much.

16           THE COURT:  Nice to see you.

17           MR. GORENBERG:  Nice to see you too.

18           THE COURT:  I actually enjoyed it.

19           (Proceedings concluded 11:55 a.m.)

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT:

4   NORTHERN DISTRICT OF GEORGIA:

5

6               I hereby certify that the foregoing pages, 1 through

7   39, are a true and correct copy of the proceedings in the case

8   aforesaid.

9               This the 7th day of November, 2013.

10

11                         /s/ *Amanda Lohnaas*

12                         _____
                           Amanda Lohnaas, CCR-B-580, RMR, CRR
13                         Official Court Reporter
                           United States District Court
14

15

16

17

18

19

20

21

22

23

24

25